UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                CASE NO. 6:21-cr-63-PGB-GJK

IRAN V. BACKSTROM
 a/k/a Shariyf Noble

## UNITED STATES' SENTENCING MEMORANDUM

Over the course of approximately two years, Iran V. Backstrom orchestrated a nationwide tax refund fraud scheme that involved more than 200 participants in at least 19 different states. Backstrom and his coconspirators enabled scheme participants to file hundreds of false tax returns that claimed more than $64 million dollars in refunds that the participants were not entitled to receive.

Backstrom's crimes are extremely serious. Backstrom recruited sub-promoters throughout the country to carry out the scheme. He encouraged participants to violate the tax laws by filing false refund claims. He took steps to thwart Internal Revenue Service fraud controls by filing and causing the filing of additional documents with the IRS to support the false tax returns. And the harm in this case is not merely hypothetical: the IRS paid out more than $38.5 million in response to the false returns that were filed by scheme participants.

As set forth below, the government respectfully submits that Backstrom's conduct warrants a term of imprisonment of 132 months. Such a sentence is sufficient, but not greater than necessary, to address the sentencing factors set forth in

1

18 U.S.C. § 3553(a), including providing just punishment for the offense, promoting respect for the law, and deterring others from engaging in similar criminal conducting the future. The Court should also order Backstrom to pay restitution to the IRS in the amount of $26,350,630 to compensate the IRS for the refund proceeds that it paid out in response to the false claims and has yet to recoup.

## I.    **PROCEDURAL HISTORY**

Backstrom was indicted on April 22, 2021. (Doc. No. 1.) On December 22, 2021, Backstrom pleaded guilty to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and two counts of aiding and assisting in the preparation and presentation of false tax returns, in violation of 26 U.S.C. § 7206(2). (Doc. Nos. 114, 116.)

Coconspirators Mehef Bey, Aaron N. Aqueron, and Yomarie D. Febres were also charged in the indictment against Backstrom. (Doc. No. 1.) Bey was a promoter of the scheme. (PSR ¶24.[1]) Aqueron was a sub-promoter of the scheme. (*See* PSR ¶25.) Febres had experience preparing tax returns professionally, and prepared returns for clients of the scheme. (PSR ¶¶23, 29.) Bey and Febres have pleaded guilty to conspiracy to defraud the United States and to various counts of aiding and assisting in the preparation and presentation of false tax returns. (*See* Doc. Nos. 90, 127.) Aqueron has pleaded guilty to conspiracy to defraud the United

---

[1] PSR references are to the initial Presentence Investigation Report prepared by the U.S. Probation Office (Doc. 161.)

States and to corruptly endeavoring to obstruct or impede the IRS.  (*See* Doc. No. 85.)

## II.  **BACKGROUND**

Beginning no later than November 2014 and continuing through at least January 2017, Backstrom, Bey, Aqueron, and Febres promoted and executed a scheme to unlawfully enrich themselves and others by making false claims to the IRS for tax refunds.  (PSR ¶21.)  As a part of their scheme, Backstrom and his coconspirators convinced some of their clients that their mortgages and other debts entitled them to tax refunds.  (*See* PSR ¶21.)  Backstrom and his coconspirators held seminars, recruited clients, and prepared false documents and tax returns for a fee that ranged from $10,000 to $15,000 per return.  (PSR ¶35.)  The tax returns falsely claimed that banks and other financial institutions had withheld large amounts of income tax from the clients, thereby entitling the clients to tax refund.  In reality, the financial institutions had not withheld any taxes from the clients and the clients were not entitled to the refund they claimed.

The coconspirators had a formalized process.  To effectuate the scheme, the coconspirators transmitted "Intake" information and documents to each other.  (PSR ¶¶27, 29.)  Typically, the coconspirators used this information to prepare two sets of false and fraudulent documents: Febres would use the "Intake" information to prepare fraudulent tax returns (PSR ¶29), and Backstrom and Bey would use the information to prepare, and have others prepare, fraudulent Forms 1099-MISC.  (PSR ¶28.)

Finally, Backstrom would email to clients various scheme-related forms and instructions on how to participate in the scheme. (PSR ¶32.) Backstrom, Bey, Aqueron, and Febres then caused their clients to submit the fraudulent tax returns, together with copies of the fraudulent Forms 1099-MISC, to the IRS. (PSR ¶34.)

### A. Backstrom and his Coconspirators Engaged in a Scheme to Defraud the United States.

Forms 1099-MISC are typically used to record income. The entity (or person) who paid the income is responsible for filing the form with the IRS and sending a corresponding Form 1099-MISC to the individual who received the income. Backstrom and Bey opened and caused others to open at least nine accounts with at least three online tax form preparation companies and submitted false Forms 1099-MISC to the IRS using these accounts. (PSR ¶26.)

There are a number of systems utilized by the IRS to process information returns like Forms 1099-MISC.[2] Large organizations, like financial institutions, typically use the Filing Information Returns Electronically ("FIRE") system to report the fact that they made some non-wage payments to a person. FIRE processes millions of information returns a year, and does not verify the accuracy of information returns. FIRE receives information from online tax form preparation companies like the ones that Backstrom and Bey used. The IRS then pulls that data, and, colloquially speaking, sends the data to other parts of the IRS so that the IRS

---

[2] Information returns are records other than tax returns that the IRS requires to document certain financial transactions.

can attempt to confirm the accuracy of the claims being made on a particular return. In essence, the IRS typically attempts to "match" the data reported by a third party on the Form 1099-MISC with the information the taxpayer reports on a return. A "mismatch" can trigger further IRS action like the issuance of a notice.

Backstrom and Bey were particularly cunning. Backstrom and Bey prepared, and had others prepare, fraudulent Forms 1099-MISC and submitted them to the IRS. (PSR ¶28.) As a part of the scheme, Backstrom and Bey used these false documents to make the income and withholding that the clients reported on their (false) Forms 1040 and 1040X *appear legitimate* to the IRS and cause it to erroneously issue the refunds claimed on their clients' tax returns: the false Forms 1099-MISC filed through the accounts that Bey and Backstrom opened or cause to be opened with the third-party companies included Forms 1099-MISC that matched the false income and tax withholding information reported on the Forms 1040 and 1040X filed by scheme participants. (PSR ¶30.)

Backstrom knew that the documents he created or was causing to be created were false, as he and some of his coconspirators were creating them. He also knew that these documents were not generated by the clients' financial institutions. Backstrom would email copies of false Forms 1099-MISC to his coconspirators. (Doc. No. 114, p. 22.) He would also sometimes email Aqueron and Bey to tell them that a false 1099-MISC had been accepted by the IRS. (Doc. No. 114, p. 21.)

## B. Backstrom was the Main Promoter of the Scheme.

Backstrom was the main promoter of this scheme. (PSR ¶24.) Bey was his second in command. (*See* PSR ¶24.) Backstrom and Bey supervised multiple sub-promoters – other people who promoted this scheme – in different states. These sub-promoters were responsible for recruiting participants and serving as a point-of-contact for individuals who participated in the scheme. These sub-promoters included Aqueron and Eurich Griffin, who were located in Florida,[3] and Kenneth Crawford, Jr. and John Barry, who were located in New Jersey.[4] The scheme also involved at least two tax return preparers, Yomarie Febres in North Carolina and Charese Johnson in Maryland.[5]

Backstrom gave orders to sub-promoters and directed others to make sure the scheme progressed smoothly. (*See* PSR ¶24.) Backstrom also determined whether individuals would be permitted to participate in the scheme. (PSR ¶26.) Both Backstrom and Bey provided coconspirators with instructions regarding what documents and information needed to be collected in order to effectuate the scheme (PSR ¶26.)

---

[3] On March 14, 2022, Griffin pleaded guilty to conspiracy to defraud the United States. Case No. 8:20-cr-00343 (M.D. Fla.).

[4] Crawford and Barry were convicted at trial in 2019 and 2021, respectively. Case Nos. 1:18-cr-505 and 1:20-cr-744 (D. N.J.).

[5] Johnson was convicted at trial in 2021. Case No. 1:17-cr-112 (D.D.C.).

### C. Backstrom and His Coconspirators Hid Their Participation in the Scheme.

By filing the false Forms 1099-MISC through third party companies rather than directly with the IRS, Backstrom and Bey deliberately concealed their identities as the individuals who had prepared these forms, and made it appear as if the forms were authentic and had been generated by financial institutions. (*See* PSR ¶30.)

Febres concealed her identity as a paid return preparer by falsely reporting on each of the tax returns that she prepared for clients that the return was self-prepared. (PSR ¶46.)

Backstrom instructed clients and conspirators to conceal the scheme from the IRS. (PSR ¶46.) For example, he circulated instructions explaining "WHAT TO SAY TO THE IRS." (PSR ¶43.) He also advised recipients, among other things, not to speak with the IRS or allow agents into their homes. (PSR ¶4.)

Backstrom, who also used the name "Shariyf Noble," attempted to conceal his identity as a promoter of the scheme from the IRS by instructing email recipients to, among other things, never share his email with others:

| From: | noble_204 <ivbnoble3@yahoo.com> |
|---|---|
| To: | Shariyf <ivbnoble3@yahoo.com> |
| Sent: | 4/15/2016 3:27:10 PM |
| Subject: | LETTER: PLEASE CHANGE TO FIT YOUR NEEDS & NEVER SHARE THIS WITH OTHERS! |
| Attachments: | LETTER.docx |

(PSR ¶45, USA-00125920.) As set forth below, he also instructed people to "PLEASE REMOVE MY EMAIL WHEN SHARING THIS! "THIS MESSAGE WILL SELF-DESTRUCT."" (PSR ¶45, USA-00126633 *et seq.*.):

| | |
|---|---|
| From: | noble_204 <ivbnoble3@yahoo.com> |
| To: | Shariyf <ivbnoble3@yahoo.com> |
| Sent: | 4/28/2016 1:07:25 PM |
| Subject: | PLEASE REMOVE MY EMAIL WHEN SHARING THIS! "THIS MESSAGE WILL SELF-DESTRUCT" |

**26 U.S. Code § 7214 - Offenses by officers and employees of the United States**

Backstrom and Bey also sought to conceal their identities as promotors of the scheme by limiting their contact with, and connections to, clients.  (PSR ¶46.)  For example, Backstrom and Bey indicated to Aqueron that their preference was to receive payments from clients in cash.  (PSR ¶46.)  Backstrom also had clients and conspirators deposit payments into bank accounts held in the names of nominees. (PSR ¶46.)

Backstrom called Aqueron from a variety of different phone numbers.  (PSR ¶46.)  Backstrom did not like to discuss the details of the scheme via email and would often tell Aqueron to call him or that he would answer his questions when he saw Aqueron in person.  (PSR ¶46.)

In total, in 2014, 2015, and 2016, Backstrom received approximately $1 million in income. (PSR ¶72.)  Needless to say, Backstrom failed to file tax returns or pay taxes on this income, thereby further concealing his participation in this fraud from the IRS.

## D. Backstrom Persisted with the Scheme Even After He Was Put on Notice that He Was Engaged in Fraud.

As early as July 2015, the IRS advised Aqueron that the tax arguments he raised in connection with the scheme were "frivolous" and had "no basis in law." (PSR ¶37.)  Aqueron emailed a copy of this letter to Backstrom, Bey, and Febres the

8

next day.  (PSR ¶37.)  Aqueron also advised Backstrom and Bey via phone in 2015 of other participants in the scheme who received frivolous filing letters from the IRS. (PSR ¶37.)

Instead of shutting down their operation after they learned about the IRS's efforts to investigate the scheme and collect refunds that were issued erroneously, Backstrom and Bey continued to encourage taxpayers to participate in the scheme. (PSR ¶38.)  They also continued preparing false tax returns for clients.  For example, after Aqueron received notice from the IRS in July of 2015, Backstrom, Bey, and Febres still prepared false returns for clients, L.S. and N.S., a married couple in October-November 2015.  (PSR ¶48-49.)  They also caused a false document prepared for clients, R.R. and S.R., to be filed with the IRS. (PSR ¶54-55.)

When the IRS started investigating the scheme and attempting to collect refunds that had been issued erroneously, Backstrom and Bey coordinated an effort to thwart the IRS.  (*See* PSR ¶38.)  They began instructing clients to engage in efforts to impede IRS collection, and they began disseminating instructions and templates, as described above, to clients to assist them in impeding IRS collection.  (PSR ¶38.)

Backstrom and Bey then took their fraudulent scheme one step further.  In March 2016, Backstrom and Bey called a meeting of approximately 20 scheme "managers," one of whom was Aqueron.  (PSR ¶40.)  Meeting attendees *discussed the fact that the IRS scrutinized filings* that had the characteristics of the scheme.  (PSR ¶40.)  Again, instead of shutting down the scheme after learning the IRS was on to them, attendees also discussed revamping and restarting the scheme.  After this

meeting, Backstrom directed coconspirators to prepare false and fraudulent returns using a new method. (PSR ¶40.) Febres emailed Backstrom a document to be disseminated to clients containing instructions on how to "properly" file scheme-related forms, including the fraudulent Forms 1099-MISC. (PSR ¶40.) Bey subsequently emailed indicted and unindicted coconspirators, including three sub-promoters who attended the meeting, a new "Mortgage Information Sheet" to give to clients. (PSR ¶42.)

Undeterred by IRS efforts to stop them, Backstrom and his coconspirators continued with their scheme to steal millions from the United States Treasury.

## III.    GUIDELINES CALCULATION AND RECOMMENDED SENTENCE

### A.    Guidelines Calculation

Although the United States Sentencing Guidelines are no longer mandatory, the Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Snipes*, 611 F.3d 855, 870 (11th Cir. 2010) (noting that the Sentencing Commission promulgated tax guidelines after empirical study of tax and other white-collar crimes).

The United States and the PSR (Doc. 161) calculate Backstrom's guidelines as follows:

| Offense Level | | |
|---|---|---|
| **Description** | **USSG §** | **Level** |
| Base Offense Level (referencing §2T1.4)<br>Base Offense Level (referencing §2T4.1)<br>Tax Table (tax loss more than $25 million, less than $65 million) | 2T1.9(a)(1)<br>2T1.4(a)(1)<br>2T4.1(L) | 28 |
| Defendant committed the offense as part of a pattern or scheme from which he derived a substantial portion of his income, or was in the business of preparing or assisting in the preparation of tax returns; or<br>The conduct was intended to encourage persons other than or in addition to co-conspirators to violate the internal revenue laws or impede, impair, obstruct, or defeat the ascertainment, computation, assessment, or collection of revenue. | 2T1.4(b)(1)<br><br>or<br><br>2T1.9(b)(2) | +2 |
| The offense involved sophisticated means. | 2T1.4(b)(2) | +2 |
| Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. | 3B1.1(a) | +4 |
| Acceptance of Responsibility (General) | 3E1.1(a) | -2 |
| Acceptance of Responsibility (Timely Notification) | 3E1.1(b) | -1 |
| Total: | - | 33 |

**B.    The Court Should Apply the Two-Level Upwards Adjustment for Sophisticated Means.**

The United States understands that the remaining objection to the Guidelines in this case relates to the upwards adjustment for sophisticated means. Backstrom's conduct with respect to both execution and concealment was especially complex and intricate. As set forth in the United States' Opposition to Iran V. Backstrom's

Objections to the Sentencing Guidelines, Doc. No. 163, the United States submits that this two-level upwards enhancement should apply.

As the Guidelines explain, "sophisticated means" means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG §2T1.4, Application Note 3. The Guidelines further provide that "[a]lthough tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." USSG §2T1.1, Comment Background.

It is sufficient if the totality of the scheme was sophisticated. *See United States v. Clum,* 607 Fed. App'x 922, 930–931 (11th Cir. 2015) (discussing sophisticated means in the context of 18 U.S.C. § 286 and 18 U.S.C. § 287 charges in fraudulent 1099-OID form case). The dual filing of a false tax return and a false corroborating document made the scheme that Backstrom engaged in more sophisticated than the typical tax fraud scheme, and it warrants an enhancement. *See United States v. Bickart*, 825 F.3d 832, 838 (7th Cir. 2016) ("[T]he [defendants'] fabrication of the 1099-OID forms to corroborate their false return represents concealment that moves this case beyond basic tax fraud.").

"[T]he essence of the definition [of sophisticated means] is merely deliberate steps taken to make the offense difficult to detect." *United States v. Toto-Ngosso*, 407 Fed. App'x 687, 692 (4th Cir. 2011) (citation omitted) (unpublished) (upholding the application of sophisticated means for a return-preparer defendant who, in order to

12

conceal his offense of preparing false returns, used an electronic filing number registered to another entity to file his clients' returns and bank accounts held in the names of others to deposit preparation fees, among other acts). Backstrom took such sophisticated steps.

Here, Backstrom's tax scheme was more complex and demonstrates a greater intricacy of planning than a routine false return case: the filing of false Forms 1099-MISC to backstop the fraudulent refund claims is more sophisticated than your usual fraudulent return preparer who claims false items on a client's return to inflate the refund. Backstrom and his coconspirators took the additional steps of creating accounts at multiple online tax form preparation companies, creating false Forms 1099-MISC, and then filing those forms with the IRS. Moreover, Backstrom and some of his coconspirators sought to conceal their involvement in the scheme and took steps to make it difficult for the IRS to identify the fraudulent documents that Backstrom and his coconspirators were preparing and filing with the IRS. Backstrom should receive a two-point enhancement for using sophisticated means.

### C.    Guidelines Range

Based on an offense level of 33 and a criminal history category of I, the Guideline imprisonment range is 135-168 months. However, the statutory maximum for one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and two counts of aiding and assisting in the preparation and

13

presentation of false tax returns, in violation of 26 U.S.C. § 7206(2), is 132 months.[6]

Accordingly, notwithstanding the Guidelines range, the maximum sentence that the

Court can impose is 132 months.

## IV.    18 U.S.C. § 3553(a) FACTORS

In imposing sentence, the Court must also weigh the sentencing factors set

forth in 18 U.S.C. § 3553(a) and fashion a sentence that is sufficient, but not greater

than necessary, to address the factors set forth in that statute.  Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of

the defendant; (2) the need for the sentence imposed to reflect the seriousness of the

offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to

protect the public from further crimes of the defendant; (4) the need to provide the

defendant with educational and vocational training, medical care, or other

correctional treatment in the most effective manner; (5) the Guidelines and policy

statements issued by the Sentencing Commission; (6) the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found

---

[6] Count One of the Indictment carries a maximum sentence of: five years' imprisonment; a fine of up to $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater; a term of supervised release of not more than three years; and a special assessment of $100. Counts Two and Eight carry a maximum sentence of: three years' imprisonment; a fine of up to $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater; a term of supervised release of not more than one year; and a special assessment of $100.

guilty of similar crimes; and (7) the need to provide restitution to any victim of the offense. 18 U.S.C. § 3553(a).

For the reasons set forth below, the government respectfully submits that Backstrom's conduct warrants a term of imprisonment of 132 months.

## A.    Nature and Circumstances of the Offense.

Backstrom's conduct in this case was not confined to a single, isolated event, or a single tax filing season. Instead, he executed a tax scheme and aided and assisted in the preparation of hundreds of fraudulent tax returns over the course of two years. He filed or caused to be filed false tax documents on behalf of his clients with no regard to the very real consequence that they would be examined by the IRS and required to pay back the erroneous refunds to the IRS. Backstrom's conduct in this case was particularly nefarious because, as discussed above, he attempted to conceal his association with the fraudulent returns from the IRS.

Moreover, Backstrom's conduct persisted even after he was repeatedly put on notice by the IRS that he was engaged in fraud. Not only did he continue to encourage taxpayers to participate in the scheme, he and Bey began instructing clients to engage in efforts to impede IRS collection. When that effort failed, Backstrom and Bey called a meeting and revamped the scheme.

Backstrom intended to cause a loss of over $64 million, and caused an actual loss of approximately $38.5 million. This is an extraordinary loss to the Treasury and to consequently the American people.

**B.    History and Characteristics of the Defendant.**

Backstrom stated he endured a tough childhood.  (PSR ¶103.)  Backstrom stated that he observed his mother abuse illicit narcotics, and that he lacked food, utilities, and proper clothing for school during periods of his childhood.  (PSR ¶103.)

However, these facts do not absolve Backstrom from culpability in this case: Backstrom chose to execute a scheme to defraud the United States, advertised his scheme to people across country, recruited clients, fabricated documents (or caused them to be fabricated), coordinated a response to IRS collection actions, and changed the scheme when he learned the IRS was on to him.  Backstrom essentially stole from the federal government in order to prosper.  He chose to personally benefit from the conspiracy.

**C.    Need for the Sentence to Reflect Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment.**

Tax crimes harm every honest, taxpaying citizen.  U.S.S.G. § 2T1.1, Background ("Tax offenses, in and of themselves, are serious offenses . . . .").  Backstrom is responsible for an intended tax loss of over $64 million, and actual tax loss of approximately $38.5 million.  The latter figure represents the sum of all the refund checks that the IRS issued based on fraudulent returns that Backstrom and his coconspirators filed and caused to be filed.

According to the U.S. Sentencing Commission, the median loss for tax fraud offenses in fiscal year 2020 was $339,071.[7] Only 14.1% of cases involved loss amounts greater than $1.5 million. (*Id.* at 1.) Backstrom's criminal conduct caused an actual loss of 113 times the median loss for tax fraud offenses. These figures alone are serious and such severe conduct demands a commensurate sentence.

**D.  Need for General Deterrence, and to Protect the Public from Further Crimes of the Defendant.**

Deterrence is of paramount importance in cases involving white collar offenses. *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2012) ("[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed."); *see also Snipes*, 611 F.3d at 872 (acknowledging importance of deterrence in the course of affirming sentence in tax case). Deterrence occupies a particularly important role in sentencing for criminal tax offenses because tax prosecutions are relatively rare. *See* Introductory Cmt. to U.S.S.G. § 2T1.1 ("Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.").

---

[7] *See* QUICK FACTS: TAX FRAUD OFFENSES, at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY20.pdf

Recognizing the infrequency of tax prosecutions, the Fourth Circuit explicitly endorsed the importance of incarcerating tax evaders as a means of general deterrence:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010). Fraudulent refund schemes such as the one perpetrated in this case are rampant despite the IRS's best efforts to stop them.

The Fourth Circuit's reasoning applies to scheme promoters such as Backstrom. Backstrom and his coconspirators engaged in a multi-state conspiracy with people such as Aqueron, Crawford, and Barry recruiting participants to file false tax returns, and others like Febres and Johnson preparing fraudulent returns for those participants. The sort of tax fraud perpetrated by Backstrom and his coconspirators has the potential to cause widespread harm to the nation's system of tax administration.

Deterrence is crucial in fraudulent tax return cases such as this one because such crime can be pervasive. Unfortunately, it is easy to prepare hundreds of fraudulent tax returns in one tax filing season; a single return preparer has the ability

to cause great monetary loss and widespread harm to the nation's system of tax administration.

Significant specific deterrence is also needed in this case. Tax fraud schemes like the one orchestrated by Backstrom undermine the trust that is essential to our nation's tax laws. Backstrom has demonstrated he has no regard for the tax laws of this country, and that he will keep abusing the federal tax system regardless of whatever notice he receives that what he is doing is wrong. The need for specific deterrence is heightened in this case because Backstrom persisted in his misconduct *after* participants in the scheme received warnings from IRS about the illegality of the scheme and even revamped the scheme in response to IRS scrutiny.

A strong sentence is critical in this case to send a message to those who intend to get rich by cheating the government. Those who voluntarily comply with their tax obligations need to know that the tax laws are enforced. Taxpayers also want to know that those who choose to violate the tax laws, like Backstrom, will be punished.

### E. The Need to Avoid Unwarranted Sentence Disparities.

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where such crimes constitute a defendant's first offense. *See, e.g.* S. Rep. No. 98-225, at 77 (1983) (legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission) ("[S]ome major offenders, particularly white-collar

offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses.").  Here, a sentence of 132 months will reflect the seriousness of the offense, respect for law, and will provide for just punishment.

As explained in the notice filed contemporaneously with this memorandum, individuals who participated in Backstrom's scheme as sub-promoters, a return preparer, and sometimes also clients, have been sentenced to significant terms of imprisonment.  Three out of the four individuals sentenced as part of this scheme thus far received significant Guidelines sentences.[8]

Backstrom should not receive a below-Guidelines sentence because to do so would create an unwarranted sentencing disparity between him and Crawford and Barry, who were below Backstrom in scheme hierarchy. (PSR, p. 2.)  The recommended sentence of 132 months is appropriate in this case, and is consistent with sentences imposed on others who engaged in similar nationwide or large-scale tax fraud schemes.  *See e.g.*, *United States v. Cyster*, No. 6:12-cr-6156-2 (W.D.N.Y. 2012) (sub-promoter of international Form 1099-OID scheme, with intended loss of $9.8 million and Guidelines range of 135-168 months, sentenced to 135 months following trial); *United States v. Jenkins*, No. 2:13-cr-425 (D. Utah 2013) (accountant participating in Form 1099-OID scheme, with intended loss of $9.4 million and Guidelines range of 78-97 months, sentenced to 78 months following trial).  When

---

[8] Charese Johnson was the only person to receive a downward variance.  But none of Johnson's clients received refunds, while in the above-captioned case there was an approximately $38.5 million actual loss to the government.

district courts impose below-Guidelines sentences for such schemes, the sentences are still substantial. *See*, *e.g.*, *United States v. Johnson*, No. 1:18-cr-388-3 (D.D.C. 2018) (false return preparer in nationwide *Backstrom*, *et al.* scheme, with intended loss of $6.6 million and Guidelines range of 78-97 months, sentenced to 36 months following trial); *United States v. Sookdeo*, No. 6:12-cr-6156-1 (W.D.N.Y. 2012) (sub-promoter of international Form 1099-OID scheme, with intended loss of $9.8 million and guidelines range of 78-97 months, sentenced to 60 months following guilty plea); *United States v. Jones*, No. 0:11-cr-60273-1 (S.D. Fla. 2013) (false return preparer in nationwide Form 1099-OID scheme, with intended loss of $120 million and Guidelines range of 210-262 months, sentenced to 144 months following guilty plea); *United States v. Upshur*, No. 2:18-cr-124-2 (E.D. Pa. 2018) (promoter and organizer of tax refund scheme, with intended loss of $300 million and Guidelines range of 324-405 months, sentenced to 84 months following trial.) The same is also true when defendants' guidelines ranges exceed the maximum penalty permitted by statute. *See*, *e.g.*, *United States v. Brekke*, No. 2:10-cr-328-1 (W.D. Wash. 2010) (promoter of international Form 1099-OID scheme, with intended loss of $763 million and guidelines range of life, sentenced to 144 months following trial); *United States v. Colaco*, No. 2:10-cr-328-3 (W.D. Wash. 2010) (sub-promoter of international Form 1099-OID scheme, with intended loss of $763 million and guidelines range of life imprisonment, sentenced to 108 months following trial).

## V.    RESTITUTION

The Court should order Backstrom to pay restitution to the IRS as a condition of his sentence to compensate it for the actual losses it sustained as a result of the refund fraud scheme, pursuant to 18 U.S.C. 3663A(a)(1). *See, e.g., United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) ("Restitution is desirable but so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and-blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail.") (citation omitted).

The returns filed by Backstrom and his co-coconspirators caused the IRS to issue refunds totaling $38,572,217.  (PSR ¶77.)  Although the IRS has been able to recoup a portion of these refunds from the participants to whom they were issued, a substantial balance remains.  As of January 2022, the IRS has yet to collect $26,350,630.03 of the more than $38 million in erroneous refunds that it issued.  The United States respectfully requests the Court order the aforementioned figure as restitution in this case.

Finally, the United States notes that some – but not all – of the clients associated with Backstrom were also associated with coconspirators Bey, Febres, and

Aqueron.[9]  As such, the United States respectfully submits restitution should be ordered joint and severally with Bey, Aqueron, and Febres.

## VI.    CONCLUSION

Backstrom peddled a fraudulent tax scheme through which he encouraged others to file fraudulent tax returns claiming million in tax refunds, all while charging exorbitant fees.  Not only did he invent a complex scheme that tricked the IRS into issuing $38.5 million in erroneous refunds, he also orchestrated an effort to thwart the IRS, and persisted in this conduct after being put on notice that he was engaged in fraud.  He cheated the government – and by extension the American people – out of millions of dollars, and he exploited and jeopardized a tax system that is defined by honest, self-reporting taxpayers.

The United States respectfully requests this Court sentence Backstrom to a term of imprisonment of 132 months – which is below the recommended Guidelines range, but the maximum that the Court can impose under the law – and order

---

[9] Coconspirators Aqueron and Febres are responsible for significantly lower amounts of intended and actual loss, as set forth in their plea agreements.  (Docs. No. 85, 90.)

Backstrom to pay restitution to the United States Treasury in the amount of

$26,350,630.03.

/s/Melissa S. Siskind
MELISSA S. SISKIND
/s/Kavitha Bondada
KAVITHA BONDADA
/s/Isaiah Boyd, III
ISAIAH BOYD, III
Trial Attorneys
Tax Division
United States Department of Justice

/s/ Chauncey A. Bratt
CHAUNCEY A. BRATT
Assistant United States Attorney
USA No. 174
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: chauncey.bratt@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 16, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Cynthia Hernandez, Counsel for Aqueron
Fritz Scheller, Counsel for Backstrom
William Santana, Counsel for Bey
Corey Cohen, counsel for Febres

/s/ Chauncey A. Bratt
CHAUNCEY A. BRATT
Assistant United States Attorney